IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| JASON CARROLL, | § | |
| *Plaintiff*, | § § § | |
| v. | § § | Case No. 2:21-CV-0392-RSP |
| CITY OF JEFFERSON, TEXAS, et al., | § § § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION**

Before the Court is the Defendants' Motion for Summary Judgment filed by Defendants City of Jefferson[1], Texas, Victor Perot, Jim Finstrom, Tyrani Braddock, David Westbrook, Robert Baker, Sarah McKinnon, Michael Martin, and the Michael D. Martin Law Office. Dkt. No. 19. In their Motion, Defendants seek summary judgment of qualified immunity for the Individual Defendants (collectively all Defendants except the City of Jefferson). *Id.* at 1-2. On May 26, 2022, the Court heard arguments on Defendants' Motion. Having considered the briefing and oral arguments, the Court **GRANTS** the Motion.

**I.     Background**

On October 21, 2021, Defendants filed a Notice of Removal pursuant to 28 U.S.C. § 1441, removing the present suit from the 276th Judicial District Court of Marion County, Texas to this Court. Dkt. No. 1. Removal was timely sought once Carroll amended his complaint to include claims under 42 U.S.C. §§ 1983 and 1985. *Id.* Carroll brings this action against the City of Jefferson; Perot, Finstrom, Braddock, Westbrook, McKinnon in their individual capacities and in

---

[1] Although the motion includes the City in the list of movants, the motion is clearly about qualified immunity and that was what it was limited to by the Court at this early stage. (Dkt. No. 15). Accordingly, the Court will not address the claims against the City of Jefferson at this time.

1

their official capacities as City Council members at the time relevant to this suit; Baker in his individual and official capacity as City Mayor; Martin in his individual capacity; and the Michael D. Martin Law Office[2]. Dkt. No. 2 at 2-3.

Between January 6, 2020 and June 8, 2020, while serving as Chief of Police of the Jefferson Police Department ("JPD"), Plaintiff Jason Carroll made a series of posts on his personal Facebook account. Dkt. No. 22-5 at 56:15-23. These posts are the speech at issue in this case. *See* Dkt. No. 19-1. The first post depicts an image of U.S. Representative Ilhan Omar with the words "I HATE TRUMP" and then immediately below, an image of former President Donald J. Trump with the words, "MOST TERRORISTS DO" (the "Omar Post"). The second post, which was posted on June 8, 2020, depicts a statue comprised of a pacifier on top of a pedestal with the words, "AMERICA'S NEWEST MONUMENT" at the bottom of the image accompanied by the phrase "#snowflakes" (the "Monument Post"). The third post, which has no date identifying when Carroll posted it to his personal Facebook account, is a quote that reads, "So now we have Blackout Tuesday. Where celebrities refuse to perform or speak. Can we get this for the rest of the week too?" (the "Blackout Tuesday Post"). The fourth post, has no date, depicts an image of a moving truck and on the side of the moving truck are the words, "2 REPUBLICANS AND A TRUCK: Helping you move to Canada is our specialty because you can't find 2 Democrats who will work." (the "Moving Truck Post"). Finally, the fifth post, which has an illegible date, is quote that reads, "I refuse to hate my race to prove to others that I'm not racist."

On June 13, 2022, close in time to when Carroll made the Monument Post, the Black Lives Matter chapter in the City of Jefferson protested outside the Marion County Courthouse in

---

[2] The claims against "the Michael D. Martin Law Office" will be dismissed without prejudice for failure to state a claim.  Plaintiff has not even alleged a legal entity, referring to it simply as "a business."  Dkt. No. 2 at 3. Defendant's Answer specifically denies that it "is a domestic business entity of any kind." Dkt. No. 5 at 3.

Jefferson. The protesters sought the removal of a monument of a Confederate soldier located outside the courthouse. Dkt. No. 22-5 at 75:23.

On June 17, 2020, via her personal Facebook, Braddock, as a member of the City Council, informed citizens of Jefferson that a special meeting would be held on June 22, 2020 (the "Special Meeting") to discuss Carroll's social media posts. In her Facebook post, Braddock stated, "[i]n the last 48 hours, my phone has blown up with concerns, questions, cries for help regarding a post" made by Carroll and that "[i]f you want your voice heard, make a statement in support of either side . . . ." Dkt. No. 22-8. Perot, another member of City Council, also testified that he received "half a dozen to ten phone calls" related to Carroll's posts. Dkt. No. 22-5 at 70:10-11.

In between Braddock's Facebook post on June 17 and the Special Meeting, the City of Jefferson received written complaints from citizens regarding Carroll's posts. Dkt. No. 19-10. In these written complaints, citizens communicated their concerns regarding Carroll's and JPD's ability to provide police services without regard to race. *See id.* at 1 ("Imagine being pulled over by the chief of police KNOWING he was making a mockery out your feelings towards slavery."); *see also id.* at 4 ("I fear for not only others but myself getting pulled over or stopped somewhere not knowing if [Carroll's] intentions are good. If he remains in office I also fear for the fact I do not know how others will deal with the matter . . . knowing what they know now.").

At the Special Meeting on June 22, individuals were given an opportunity to voice their concerns about Carroll's posts and whether Carroll should remain the Chief of Police. During the open session of the Special Meeting, the citizens generally communicated their concerns that they could not trust Carroll would be unbiased and that they questioned whether he could remain as

3

Chief of Police. *See* Dkt. No. 22 at 12 n.5 (citing to a complete recording of the open session of the Special Meeting[3]).

After the open session, the Individual Defendants met with Carroll in a closed session, in which the Individual Defendants discussed Carroll's future as the Chief of Police. Although the parties dispute whether Carroll was given an ultimatum to either resign or be terminated, the parties agree that two things happened: Perot communicated to Carroll that Carroll did not have the votes to be retained as Chief of Police, and Carroll was given an opportunity to make a call. After Carroll called his father, Carroll returned to the closed session and orally offered his resignation. The Defendants then, in open session, voted to accept Carroll's resignation. *E.g.* Dkt. No. 19-7 at ¶ 18. Carroll then submitted to the City Council a written resignation the next day. Dkt. No. 19-11.

In their Motion, the Defendants move for summary judgment of qualified immunity for the Individual Defendants on Carroll's First Amendment retaliation, § 1983 civil conspiracy, and § 1985(2) civil conspiracy claims. Dkt. No. 19 at 1-2. Carroll filed a combined response and cross-motion seeking partial summary judgment of no qualified immunity; however, by filing a combined response and cross-motion, Carroll violated Local Rule CV-7(a), which requires motions be filed as a separate document.

## II.     Legal Standard

### a. Summary Judgment

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record "which it believes

---

[3] Plaintiff also submitted a CD-ROM with the Special Meeting Recording. The recording was included on the same CD-ROM that contains Plaintiff's Exhibits 11 and 12, Dkt. No. 22-11 and Dkt. No. 22-12 respectively.

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.

### b. Qualified Immunity

"The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Zadeh v. Robinson*, 928 F.3d 457, 463-64 (5th Cir. 2019) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370-71 (5th Cir. 2011)). Officials are protected by qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19, (1982). "The basic steps of our qualified-immunity inquiry are well-known: a plaintiff seeking to defeat qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Morgan*, 659 F.3d at 371 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

## III.  Analysis

### a. Constitutional Violation

For a First Amendment retaliation claim, "[a] plaintiff must show that "(1) he suffered an adverse employment action; (2) his speech involved a matter of public concern; (3) his interest in speaking outweighs the employer's interest in promoting efficiency in the workplace; and (4) his speech motivated the employer's adverse employment action." *Gibson v. Kilpatrick*, 838 F.3d 476, 481 (5th Cir. 2016) (quoting *Charles v. Grief*, 522 F.3d 508, 510 n. 2 (5th Cir. 2008)).

### i. Adverse Employment Action

"Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Breaux v. City of Garland*, 205 F.3d 150, 157 (5th Cir. 2000) (quoting *Pierce v. Texas Dep't of Criminal Justice, Institutional Div.*, 37 F.3d 1146, 1149 (5th Cir.1994)). The Fifth Circuit has "recognized that constructive discharge may be an appropriate basis for a section 1983 action." *Caldwell v. Lozano*, 689 Fed.Appx. 315, 319 (5th Cir. 2017) (quoting *Kline v. N. Tex. State. Univ.*, 782 F.2d 1229, 1234 (5th Cir. 1986)). Additionally, "a plaintiff may also be 'constructively discharged if the employer gives the employee an ultimatum to quit or be fired.'" *Id.* at 320 (quoting *Perret v. Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014)); *see also Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 319 (5th Cir. 1997).

Here, the Court finds that a genuine dispute of fact exists as to whether Carroll was given an ultimatum to resign or be terminated, thus there is dispute as to whether Carroll suffered an adverse employment action. Defendants focus on the fact that Carroll resigned. Dkt. No. 19 at 16-17. According to the Defendants, Carroll "can only offer evidence that establishes that if a vote were taken, there might not be enough votes in his favor to keep his job." *Id.* at 17. Defendants further argue that the Defendants simply criticized Carroll for his Posts and that "the Fifth Circuit does not elevate an employer's criticism—even an express threat to fire an employee—to the level of an adverse employment action." *Id.* at 18.

However, Defendants' arguments are unpersuasive on this element for two reasons: their arguments (1) exhibit a misunderstanding of what constitutes an adverse employment action and (2) fail to address the evidence offered by Carroll. First, an express threat to fire would most likely constitute an adverse employment action. In *Faruki*, one of the plaintiffs was told he should find another job, that the defendants would be unable to retain him, and that he had one week before

6

he would be placed on indefinite unpaid leave. *Id.* at 319. The Fifth Circuit held that these statements by the defendants regarding the plaintiff's employment status were "compelling evidence of constructive discharge" and that at the summary judgment stage the defendants' statements "established a genuine issue of material fact on the discharge element . . . ." *Id.* Thus, the Court finds that a defendants' express threat to resign or be terminated would create, at a minimum, a genuine issue of fact on this element like the defendants' statements in *Faruki* telling the plaintiff to find another job or he would be placed on indefinite unpaid leave in a week.

Second, Defendants fail to contradict Carroll's summary judgment evidence that the Defendants offered Carroll an ultimatum. Carroll offers testimony from Perot that states Carroll was given a choice between being publicly terminated or resigning, and that if he did not resign, Carroll "would have been terminated in open meeting." Dkt. No. 22-5 at 133:15-22. Carroll also offers McKinnon's deposition testimony that further supports that Carroll was given the option to either be publicly terminated or resign. Dkt. No. 22-6 at 31: 6-13. Thus, Defendants' argument—that no adverse employment action occurred because Carroll resigned—fails to contradict Carroll's argument that he resigned in the face of an express threat of termination, thus was constructively terminated. Because of this, the Court finds that there is a genuine dispute as to whether Carroll suffered an adverse employment action.

### ii. Citizen speaking on a matter of public concern

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). When determining whether a public employee is speaking as a citizen on a matter of public concern, "a court must first decide whether the plaintiff was speaking as a

7

citizen disassociated with his public duties, or whether the plaintiff was speaking in furtherance of the duties of his or her public employment." *Howell v. Town of Ball*, 827 F.3d 515, 522-23 (5th Cir. 2016) (citing *Garcetti*, 547 U.S. at 421). The Defendants offer no arguments that Carroll was not speaking as a citizen and instead focus on the second part of this element—whether the speech was a matter of public concern.

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Gibson*, 838 F.3d at 482 (quoting *Lane v. Franks*, 573 U.S. 228, 241 (2014)). "Public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

Defendants initially argue that Carroll's speech "can be best characterized as addressing only matters of personal concern" because the posts do not comment on events occurring in the City of Jefferson. Dkt. No. 19 at 21. Later, in their reply and at the hearing, Defendants characterize the speech as "racially insensitive," *e.g.* Dkt. No. 24 at 13, and generally argue that this kind of speech does not contribute to an informed dialogue and therefore it is not related to a matter of public concern. Dkt. No. 24 at 8 (citing *San Diego v. Roe*, 543 U.S. 77, 82-83 (2004)).

In response, Carroll argues that the content of Carroll's speech focuses on political issues, specifically race, and does not relate to Carroll's position as Chief of Police. Dkt. No. 22 at 9-13. Carroll argues that "speaking about race is generally always a matter of public concern" and that his speech "touched on matters of racial activism," specifically pointing to the BlackOut Tuesday post. *Id.* at 10-11. Furthermore, Carroll argues that his speech "did not concern the management policies of the Jefferson Police Department" and "did not involve an internal personnel dispute or

working conditions." *Id.* at 13. As to the form, Caroll's speech occurred on his personal Facebook page, which was not set to private, thus allowing anyone to view Carroll's posts. *Id.* at 14. Finally, for the context, Carroll simply argues that this speech was not made in the context of an employee-employer relationship; he was not on duty; and he was not prompted to speak by anything related to his position as Chief of Police. *Id.* at 14-15.

Based on the arguments and evidence before the Court, it finds that Carroll's speech was on a matter of public concern. Beginning with the content, the Court finds unpersuasive Defendants' argument that the allegedly "racially insensitive" nature of Carroll's posts prevents a finding that Carroll was speaking on a matter of public concern. The Supreme Court has stated that "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987). "Debate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Thus, the fact that Carroll's speech is denigrating to minorities does not automatically mean the posts are not commenting on a matter of public concern and do not deserve First Amendment protection.

Additionally, the Court finds the Defendants' reliance on *Roe* misplaced. In *Roe*, the Supreme Court held that Roe's speech—which consisted of pornographic videos depicting Roe engaging in sexual acts while wearing the uniform of his employer, the San Diego Police Department, *id.* at 78-79—was not a matter of public concern because it did "nothing to inform the public about any aspect of the SDPD's functioning or operation. Nor were Roe's activities like the private remarks at issue in *Rankin*, where one co-worker commented to another co-worker on an item of political news." *Id.* at 84. Thus, not only is *Roe* factually distinct from this case, but *Roe*

held, as did *Rankin*, that commenting on an item of political news can satisfy the "public concern" requirement under certain conditions.

Here, the Court finds that the content of the post, even though denigrating to minorities, related to topics of legitimate news interest that were occurring around the nation. Thus, the content factor weighs in favor of finding this a matter of public concern.

The other two factors—form and context—also weigh in favor of finding this speech relating to a matter of public concern. For form, Carroll placed the posts on his public, personal Facebook page, and given the public nature of Facebook, this weighs in favor of finding this is speech on a matter of public concern. *Graziosi v. City of Greenville Miss.*, 775 F.3d 731, 739 (5th Cir. 2015) (finding that speech on Facebook weighs the form factor in favor of finding a matter of public concern because Facebook is a "medium accessible by the community"). As to context, Carroll's speech occurred outside the employee-employer context, which weighs in favor of finding the speech related to a matter of public concern. Because Carroll spoke as a citizen and the factors weigh in favor of his speech relating to a matter of public concern, the Court finds that Carroll's speech receives some protection under the First Amendment.

### iii.  Interest outweighed the employer's interest

Having found Carroll was speaking as a citizen on a matter of public concern, the Court next weighs the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees against the interests of the employee, as a citizen, in commenting upon matters of public concern.'" *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin*, 483 U.S. at 388. Furthermore, when balancing, the Court can consider

10

"whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* (citing *Pickering*, 391 U.S. at 570-73).

"It is for the court to determine the importance of a plaintiff's speech interest, to determine the importance of a governmental interest in efficient operations, and to balance the relative weight of each." *Kinney v. Weaver*, 367 F.3d 337, 363 (5th Cir. 2004) (*en banc*). When balancing the interests between the plaintiff and the government, the court is to focus on "how the speech at issue *affects* the government's interest in providing services efficiently: it is the speech's detrimental effect on the efficient delivery of public services that gives the government a legitimate interest in suppressing it." *Id.* at 362 (emphasis in original). However, it is unnecessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Graziosi*, 775 F.3d at 741 (quoting *Connick*, 461 U.S. at 152). The government may rely on some "reasonable predictions" or "danger" of disruption. *Id.* (citations omitted); *Rankin*, 483 U.S. at 390–91. The determination that the speech is detrimental (i.e. disruptive) must be based on facts "as the employer reasonably found them to be." *Waters v. Churchill*, 511 U.S. 661, 677 (1994).

Here, Carroll's argument is predicted on a distinction between internal and external disruption, with the distinction turning on whether Carroll's speech caused a disruption within or external to the JPD. According to Carroll, this distinction can be found in *Kinney*. Dkt. No. 28 at 6 (citing *Kinney*, 367 F.3d at 364) ("The Fifth Circuit has refused to accept evidence of disruption that is linked to external department disruption attributable to third parties that are not within the department at issue."). The Court does not find, nor do the Defendants argue, that Carroll's speech

11

caused issues within the JPD. The question is whether Carroll's speech interfered with the ability of the JPD to efficiently provide services to the citizens of the City of Jefferson.

On this issue, Defendants argue that "it is crucial that the citizens of the City trust the municipal police officers, and do not consider them to be hostile in the application of the law. These principles apply even more so to the Police Chief . . ." Dkt. No. 19 at 23. Defendants further argue, citing the complaints the City of Jefferson received from citizens, that "[t]here can be little doubt that these Facebook posts were disruptive, and certainly affected the City of Jefferson's ability to efficiently provide its public police services to all individuals." *Id.* at 24.

In response, Carroll argues that summary judgment should be denied because "Defendants rely on external disruption created by Braddock, an official acting with retaliatory intent." Dkt. No. 22 at 18. Carroll argues that Braddock, because of her animosity towards Carroll, pushed for the Special Meeting "to essentially gang up on the Plaintiff and ridicule him." Dkt. No. 28 at 10. Carroll further argues that the complaints and predictions of future disruption are only supported "by using self-created disruption through external complaints and media attention that Defendant Braddock caused." *Id.* at 11. Thus, according to Carroll's reading of *Kinney*, the Court cannot consider the complaints as evidence of disruption since those complaints originated with the Defendants.

The Court finds that here, the importance of providing efficient and trusted police services to the citizens of the City of Jefferson outweighs the limited interest and value Carroll had in his speech. This finding is primarily based on *Nixon v. City of Houston*, 511 F.3d 494 (5th Cir. 2007) and *Rankin*. Beginning with *Nixon*, the Fifth Circuit held that, under *Pickering*, Nixon's speech was not protected under the First Amendment and therefore, the Houston Police Department ("HPD") did not violate Nixon's First Amendment rights when they terminated him. *Nixon*, 511

F.3d at 501. In *Nixon*, there were two separate acts of speech, but the act relevant to the present case was a journal article written by Nixon that contained certain "caustic, offensive, and disrespectful" statements regarding certain groups of citizens, specifically minorities. *Id.* at 496.

HPD argued that Nixon's articles undermined public confidence in the HPD and the Fifth Circuit agreed, stating:

> Given the exposure of Nixon's articles to the Houston community and the caustic statements in some of his articles, it was reasonable for HPD to believe that his articles would negatively impact the relationship between HPD and Houston citizens and generally bring the mission of the police department and the professionalism of its officers into serious disrepute—certainly legitimate and substantial interests, harm to which would undoubtedly impair the proper performance of HPD functions.

*Id.* at 500-01 (internal quotation marks and citations omitted).

These important government interests were weighed against Nixon's interest in being able to comment upon matters of public concern. However, the Fifth Circuit held that Nixon's speech received less weight under *Pickering* "by the fact that a significant amount of his speech is directed at denigrating certain segments of the Houston population" *Id.* at 501. Thus, the Fifth Circuit recognized that Nixon's interest in commenting upon matters of public concern, although substantial, received less weight and therefore was outweighed by the importance of the government interests his speech threatened. *Id.* Therefore, the Fifth Circuit found no First Amendment violation, stating that HPD needed to "be able to prohibit such speech if it is to perform its function and maintain its professionalism." *Id.*

Turning to *Rankin*, the Supreme Court held that a private remark between employees concerning an assassination attempt on the President was protected under the First Amendment. *Rankin*, 483 U.S. at 392. Supporting the Supreme Court's holding in *Rankin* was the fact that McPherson, the terminated employee, was a low-level employee: "some attention must be paid to

13

the responsibilities of the employee within the agency. The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Id.* at 390.

Reading *Nixon* and *Rankin* together, the Court finds that the government's interests in this case outweigh Carroll's interest in his speech. First, Carroll's speech is due little weight in the *Pickering* analysis. Carroll has not argued any specific interest in his speech beyond the general interest in being able to comment on a matter of public concern. Although this is normally a substantial interest, Carroll's interest in his speech, like Nixon's, is reduced by the speech's caustic and denigrating nature. Even treating this as misplaced "political humor" as Carroll described it, this does not change the fact that his humor utilized caustic and denigrating messages, such as that an elected official is a terrorist based on the color of her skin; snowflakes (which is derogatory term for millennials) are crybabies, and members of the Democratic political party are lazy.

Further reducing the weight of Carroll's interest in the *Pickering* analysis is the fact that Carroll was the Chief of Police at the time the speech was made. Based on *Rankin*, the position of the employee allegedly terminated for his speech is a relevant consideration when balancing the interests. *Rankin*, 483 U.S. at 390-91. Here, given the extent of his authority and public accountability, Carroll as Chief Of Police accepted a "burden of caution" to avoid speech that would negatively affect the ability of the JPD to provide services. *C.f. id.* at 390. Therefore, Carroll's disruptive speech is due less weight in the *Pickering* balancing.

Second, Defendants receive more weight in the balancing because of their "legitimate and substantial" interest in ensuring the safety of interactions between citizens and officers, and maintaining the trust in the JPD. Under the *Pickering* balancing, the context inquiry analyzes the underlying philosophical, political, and social circumstances surrounding an employee's

14

speech. *See Moore v. City of Kilgore,* 877 F.2d 364, 371 (5th Cir.1989). The context surrounding Carroll's posts, especially the Monument Post, is important here. The Monument Post was posted on June 8, 2020, and then five days later, the Black Lives Matter chapter in the City of Jefferson organized an event to protest the monument of a Confederate soldier located outside the Marion County Courthouse in Jefferson. Given the proximity in time between the protest and Carroll's post, many of the complaints by citizens viewed Carroll's Monument Post as criticizing African-American individuals in Jefferson who were upset by the presence of a Confederate solider monument in Jefferson. *E.g.* Dkt. No. 19-10 at 1 ("So now, you have people who rightfully offended by a dark place in history and the chief of police think it's funny and calling them crybabies. . . . Imagine being pulled over by the chief of police KNOWING he was making a mockery out your feelings towards slavery."). Thus, given the caustic statements in Carroll's posts and the surrounding political and social context, the Defendants had a legitimate concern that Carroll's posts threatened the ability of the JPD to interact effectively with the citizens of Jefferson. This concern was confirmed at the open session of the Special Meeting when citizens stated they had lost trust in Carroll and the JPD because of Carroll's speech.

In fact, these concerns about trust and safety were in the minds of the Defendants during the closed session of the Special Meeting. *See* Dkt. No. 25-4 at 19:9-11 ("We, [Defendants], thought it might hamper being able to perform his duties with that many people angry at him."); 62:8-14; 83:25-84:6 ("[I]t wasn't going to be a safe situation for him or the public. . . . Because they were so angry at him that if he stopped them for a minor traffic violation, it could have turned into something a whole lot more serious."). Therefore, given the exposure of Carroll's posts to the Jefferson community and the caustic statements in some of his posts, it was reasonable for the Defendants to believe that Carroll's speech would negatively impact the relationship between JPD

and the citizens of Jefferson "and generally bring the mission of the police department and the professionalism of its officers into serious disrepute—certainly legitimate and substantial interests, harm to which would undoubtedly impair the proper performance of [JPD] functions." *Nixon*, 511 F.3d at 500-01.

Finally, Carroll's argument that Braddock caused the disruption in the City of Jefferson is a failed attempt to contort the facts of this case to make them appear analogous to *Kinney*. In *Kinney*, the plaintiffs provided expert testimony concerning the proper use of force and firearms against a police officer. *Id.* at 341-42. In response, the defendants—various law enforcement officers—implemented a boycott of the East Texas Police Academy ("ETPA") by refusing to send their officers to ETPA because the ETPA employed the plaintiffs as instructors. *Id.* at 344-45. The effects of the boycott eventually forced the plaintiffs from their positions at the ETPA. *Id.* at 345.

On appeal, the defendants in *Kinney* argued that the plaintiffs' speech strained the relationship between the ETPA and the local police, which relied on the ETPA to train its officers. However, the Fifth Circuit rejected the defendants' argument because the relationship between the ETPA and the local police was caused by the *boycott* implemented by the defendants, not the plaintiffs' speech. *Id.* at 364 ("The disruptions just noted were caused by the [defendants'] boycott, so the [defendants] can hardly rely on those disruptions as a justification for their boycott.").

Here, Carroll analogizes the Special Meeting sought by Braddock to the boycott implemented by the defendants in *Kinney*. Dkt. No. 28 at 10. Thus, Carroll is arguing that Braddock, because of a retaliatory animus, called for the Special Meeting and that it was the Special Meeting, not Carroll's speech, that strained the relationship between the JPD and the citizens of Jefferson.

16

This argument however is belied by the evidence in the record. It was clearly Carroll's speech that caused citizens to question whether they could trust the JPD. Thus, the Special Meeting is not like the boycott at issue in *Kinney* because the Special Meeting was not the mechanism that caused the disruption to the government's services. The Special Meeting was simply how the Defendants went about investigating the extent Carroll's posts impacted the community—i.e. threatened the JPD's ability to provide services to the community. Thus, the present case is distinct from *Kinney* and Carroll's reliance on it is misplaced.

In sum, the Court finds that Carroll's interest in his caustic and denigrating posts made while he was serving as the Chief of Police is due less weigh, and when Carroll's interest is weighed against the government's weighty interest in ensuring public safety and trust, the balance weighs in favor of the Defendants. Therefore, the Court finds, even if the Defendants offered an ultimatum to Carroll, there was no First Amendment violation.

### b. Clearly Established

Although the Court has concluded that there was no constitutional violation, the Court also concludes that it was not clearly established that the Defendants' alleged actions would have violated Carroll's First Amendment rights. For the clearly established element of qualified immunity, the "plaintiff bears the burden of proof. And the burden is heavy: A right is clearly established only if relevant precedent 'has placed the . . . constitutional question beyond debate.'" *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (citing *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018)); (quoting *Ashcroft*, 563 U.S. at 741)). The pertinent question is whether "the state of the law at the time of the incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Kimbriel v. City of Greenville, Miss.*, 647 F. App'x 353, 356 (5th Cir. 2016) (quoting *Cass v. City of Abilene, Tex.*, 814 F.3d 721, 728 (5th Cir. 2016);

*Tolan v. Cotton*, 572 U.S. 656, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)) (internal quotation marks omitted). Since the relevant inquiry concerns whether the official had fair warning, "reasonableness is judged against the backdrop of the law at the time of the conduct." *Tucker v. City of Shreveport, La.*, 998 F.3d 165, 173 (5th Cir. 2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)).

Thus, Carroll must point to case law that puts beyond debate the question of whether the Individual Defendants violated Carroll's First Amendment rights when the Individual Defendants—out of concern for public safety and trust in the police department—issued an ultimatum to Carroll because of his denigrating and caustic private speech.

Carroll initially argues that it is clearly established in the Fifth Circuit that terminating a public employee for their private speech is a violation of the First Amendment. Dkt. No. 22 at 24. However, the Court finds Carroll's initial argument unpersuasive. Carroll defines the right at issue at a "high level of generality" and thus, these prior cases would not put the Individual Defendants on notice that their actions would have violated clearly established law. *See Ashcroft*, 563 U.S. at 742 ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality.") (internal citations omitted).

Next, Carroll argues that "*Kinney* clearly establishes that a government official, because of retaliatory animus, cannot use his or her position to influence a third-party (third-party external complaints) to promote encouragement as a reason for government employer to terminate the government employee for exercising his or her First Amendment rights." Dkt. No. 22 at 25 (citing *Kinney*, 367 F.3d at 369-70).

This argument is also unpersuasive because, not only is *Kinney* factually distinct from the present case, as discussed above, but the Fifth Circuit has stated that *Kinney* "clearly establishes

the right of a plaintiff to be free from governmental officials' exerting their power or influence over a third-party employer to cause the plaintiff to be terminated for exercising his First Amendment rights." *Bevill v. Fletcher*, 26 F.4th 270, 282-83 (5th Cir.2022). In this case, the Defendants did not exert any power or influence over a third-party employer because the Defendants were Carroll's employer. Thus, *Kinney* would not have placed Defendants on notice that their actions here would have violated clearly established law.

Finally, Carroll argues that Braddock possessed a retaliatory motive and that it is clearly established that the existence of "a retaliatory motive" is a factual issue, which precludes summary judgment of qualified immunity in a First Amendment case. Dkt. No. 28 at 20 (citing *Tompkins v. Vickers*, 26 F.3d 603, 609 (5th Cir. 1994)). Not only is *Tompkins* factually distinct, but the fact dispute as to retaliatory motive in *Tompkins* concerned the fourth element of a First Amendment retaliatory claim—whether the speech motivated the adverse employment action. Here, the Court did not reach the fourth element and therefore does not need to consider whether the Defendants, including Braddock, possessed a retaliatory motive when determining qualified immunity.

### c. Conspiracy Claim

In addition to the § 1983 First Amendment retaliation claim, Defendants move for summary judgment on Carroll's claim of conspiracy to deprive him of his First Amendment right to free speech ("§ 1983 Conspiracy Claim") and Carroll's claim that the Defendants engaged in a civil conspiracy to obstruct justice in State Court in violation of 42 U.S.C. § 1985(2) ("§ 1985(2) Conspiracy Claim"). Dkt. No. 19 at 28-29. Taking the § 1983 Conspiracy Claim first, "a conspiracy claim is not actionable without an actual violation of § 1983." *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995). Therefore, because the Court found the Individual Defendants are entitled to

qualified immunity, there is no actual violation of § 1983. Given this, the Court finds the Defendants are entitled to summary judgment on Caroll's § 1983 Civil Conspiracy claim.

The Court finds that Carroll's § 1985(2) Conspiracy Claim fails because Carroll does not plead that the Defendants had a racial or otherwise class-based discriminatory animus, which is required for a claim brought under the cited portion of § 1985(2). *Salmon v. Miller*, 951 F.Supp. 103, 107 (E.D. Tex. 1996) (citing *Griffin v. Breckenridge,* 403 U.S. 88, 91 (1971); *Bradt v. Smith*, 634 F.2d 796, 801 (5th Cir. 1981)).

As to the Fourth Cause of Action, Carroll alleges that the Individual Defendants "failed to intervene to stop the violation of conspiracy to obstruct justice and prevent deprivation of Plaintiffs right to petition under the equal protection of the laws." Dkt. No. 2 at 32. The Court finds that the factual allegations fail to state a § 1983 failure to intervene claim.

### IV.     Conclusion

Because the Court finds no constitutional violation and that it was not clearly established that the alleged actions of the Defendants would have violated a constitutional right, the Court finds that the Individual Defendants are entitled to qualified immunity. Therefore,

IT IS ORDERED that all claims against Defendants Perot, Finstrom, Braddock, Westbrook, Baker, McKinnon, and Martin are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the claims against "the Michael D. Martin Law Office" are DISMISSED WITHOUT PREJUDICE.

**SIGNED this 5th day of August, 2022.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE